UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICIA BENAK, SUSAN TATEM, BRIAN ROFFE, SUSANNE ROY, STACEY ALANA GISSEN, MILTON PFEIFFER, LAWRENCE E. JAFFE PENSION PLAN, LAWRENCE E. JAFFE TRUSTEE U/A 1198, LAURA H. GOGGINS, and PATRICK GOGGINS, | : : : : : : : | Civil Action No. 01-CV-5734 (JLL) |
| Plaintiffs, | : : | |
| v. | : : | OPINION |
| ALLIANCE CAPITAL MANAGEMENT L.P., ALLIANCE PREMIER GROWTH FUND, JOHN D. CARIFA, ALFRED HARRISON, MARK D. GERSTEN, RUTH BLOCK, DAVID DIEVLER, JOHN H. DOBKIN, WILLIAM F. FOULK, JR., JAMES H. HESTER, CLIFFORD L. MICHEL, and DONALD J. ROBINSON, | : : : : : : : : | LINARES, District Judge |
| Defendants. | : : : | |

## INTRODUCTION

This matter is before the Court on the motion of defendants to dismiss the claims of plaintiffs Patrick and Laura Goggins for failure to file within the applicable limitations period. There was no oral argument. See Fed. R. Civ. P. 78. For the reasons set forth below, defendants' motion is GRANTED.

## BACKGROUND

Patrick and Laura Goggins ("plaintiffs") are investors who held shares of the Alliance Premier Growth Fund ("Fund") during the time period of October 2000 through November 2001

1

("Class Period").  Defendants include the Fund itself; Alliance Capital Management, the Fund's investment adviser; Alfred Harrison, the Fund's portfolio manager; and several other officers and directors of the Fund.

Plaintiffs filed this action on December 13, 2002, alleging violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("'33 Act").[1]  The gravamen of their Complaint[2] is that, because defendant Harrison negligently purchased for the Fund hundreds of millions of dollars in the stock of Enron Corporation, which subsequently collapsed, representations in the Fund's Prospectus and elsewhere concerning investment and research strategies were materially false or misleading.[3]  (Goggins Am. Compl. ¶¶ 3-5.)  While Enron executives were fleecing the company for millions, plaintiffs allege, Harrison continued, in the face of considerable warning signs, and in clear contravention of the Fund's purported exacting standards, to purchase Enron stock.  (Id. ¶¶ 6-28.)  Plaintiffs contend that it was not until November 28, 2001, just two days before Enron filed for bankruptcy, that Harrison sold the Fund's Enron holdings for a loss of roughly $900 million.  (Id. ¶ 29.)

---

[1] This action was originally filed in the Southern District of New York.  It was transferred to this Court in August 2003.  See Goggins v. Alliance Capital Mgmt., 279 F. Supp. 2d 228 (S.D.N.Y. 2003).

[2] The Court refers jointly to the original Complaint, filed December 13, 2002, and the Amended Complaint, filed December 8, 2003, as the "Complaint."  Where relevant, distinctions between the two shall be explicitly pointed out.

[3] For example, the Fund's November 2000 Prospectus stated: "Unlike most equity funds, the Fund focuses on a relatively small number of intensively researched companies.  Alliance selects the Fund's investments from a research universe of more than 500 companies that have strong management, superior industry positions, excellent balance sheets and superior earnings growth."  (Goggins Am. Compl. ¶ 63.)  Thus, an investment portfolio that included companies with objectively suspect balance sheets and visibly corrupt officers would arguably violate the stated selection process set forth in the Prospectus.

Of especial import is that the Complaint represents that "[p]laintiffs' information and belief is based upon, among other things, ... review and analysis of relevant articles that appeared in newspapers, magazines and other publications." (Id. Preamble.)  Some of those articles are cited specifically in the Complaint to demonstrate the recklessness of defendants' Enron purchases.  Among them are the following, which concern the objectively suspect nature of Enron's business and accounting practices:

> (1) a Wall Street Journal article, published September 20, 2000, "criticizing as unsound Enron's practice of 'marking to market' a variety of investments whose true financial ramifications would not be known for as much as 20 years" (Id. ¶ 328);
>
> (2) a Fortune article, published March 5, 2001, stating that "'the lack of clarity [of Enron accounting] raises a red flag about Enron's pricey stock," that "'analysts don't seem to have a clue what's in [Enron's] Assets and Investments [business] or, more to the point, what sort of earnings it will generate,'" that Enron's debt load increased by nearly $4 billion, that Enron's cash flow "declined dramatically," and that, "at a minimum, Enron stock should be trading at a substantially lower price-to-earnings ratio to reflect the fact that Enron was really a trading operation, not an energy producer" (Id. ¶¶ 348-50);
>
> (3) a report issued by TheStreet.com on May 9, 2001, which stated that "key parts of [Enron's] financial statements are confusing and opaque," which "[p]resciently ... questioned Enron's practice of engaging in related party transactions with partnerships controlled by [CFO Andrew] Fastow," which quoted "an energy analyst who stated, 'Why are they doing this?  It's just inappropriate;'" and which speculated that a certain related party transaction "'may have been used to goose earnings'" (Id. ¶¶ 355-57);
>
> (4) a report issued by TheStreet.com on July 12, 2001, which stated that "Enron was suffering huge losses in its broadband unit" (Id. ¶ 358);
>
> (5) a report issued by TheStreet.com on July 20, 2001, which "noted that Enron's executives were furiously selling the Company's stock at the same time they were publicly claiming that stock was undervalued" (Id. ¶ 359);
>
> (6) a New York Times article, published on August 29, 2001, noting "that Skilling's departure ... had 'stunned investors,'" and that "[CEO Kenneth] Lay

3

>also acknowledged that Enron's financial statements were difficult for investors to understand" (Id. ¶ 372);
>
>(7) a New York Times article, published on September 9, 2001, stating that Enron's wounds were "'self-inflicted' ... because '[h]eavy insider selling, indecipherable accounting practices and a stream of executive departures have combined to create a growing credibility gap between the company and Wall Street'" (Id. ¶ 374);
>
>(8) a Fortune article, published on September 17, 2001, opining that President Jeffrey Skilling's departure was "'bizarre,'" in light of a $20 million severance package he forfeited and a $2 million loan he absorbed that would have been paid off had he put off resigning until the end of the year (Id. ¶ 375);
>
>(9) a Wall Street Journal article, published on October 17, 2001, stating that "a particular slice" of a $1 billion write-down raised "anew vexing conflict-of-interest questions" involving Fastow and two limited partnerships (Id. ¶ 383); and
>
>(10) a New York Times article, published on November 1, 2001,[4] reporting that "the SEC had commenced a formal inquiry into Enron's transactions with the partnerships formerly headed by Fastow" (Id. ¶ 424).

These articles represent a mere sampling of the articles cited in the Complaint to establish the Fund's negligence in purchasing Enron securities. Moreover, plaintiffs cite to the following articles to demonstrate the Fund's own ostensible admission of negligence:

>(1) a Wall Street Journal article, published December 5, 2001, reporting that Harrison admitted to missing warning signs that Enron was ailing (Goggins Compl. ¶¶ 15, 32); and
>
>(2) an Economist article, published December 8, 2001, quoting defendant Harrison as saying: "The departure of former Chief Executive Jeff Skilling ... ought to have raised a red flag ... you have to wonder if there was something more afoot" (Goggins Am. Compl. ¶ 272).

The Complaint also cites the following articles, which establish both the Fund's stake in Enron during the period of apparent turmoil and its heavy resulting losses:

---

[4]The Complaint mistakenly states the publication date as November 1, 2003.

(1) a Dow Jones Newswire article, published December 4, 2001, reporting that the Fund held a substantial position in Enron (Goggins Compl. ¶ 15); and

(2) the Wall Street Journal article listed above, published December 5, 2001, reporting that the Fund was the "biggest loser among institutional investors" (Id. ¶¶ 15, 32).

There are moreover numerous articles not specifically cited in the Complaint that are relevant to this action. Among them are the following:

(1) a Wall Street Journal article, published November 29, 2001, reporting that, based on its September 30, 2001 filing, the Fund's stake in Enron "had dropped in value by about $445 million," Enron's Meltdown May Also be Felt by Big Mutual Funds, The Wall Street Journal, Nov. 29, 2001, at C13;

(2) a Houston Chronicle article, published December 5, 2001, reporting that Harrison said a "red flag" should have gone up upon the resignation of Skilling, Enron Notebook, Houston Chronicle, Dec. 5, 2001, at 4;

(3) a San Francisco Chronicle article, published December 4, 2001, reporting that Alliance owned 16.7 million shares of Enron as of September 30, 2001, that Harrison stated he still owned Enron as of mid-November, and that, with the stock trading around $8 per share, Harrison was trying to "eke something out of the Dynegy deal," Kathleen Pender, Mutual Funds Hurt by Enron's Fall, The San Francisco Chronicle, Dec. 4, 2001, at B1; and

(4) a New York Post article, published December 1, 2001, reporting that the Fund "had bought a big chunk [of Enron stock] just weeks before Enron collapsed," and that the Fund's stake "shrank from more than $1.5 billion in market value to just $42.5 million," Paul Tharp, The Enron-Around Small Investors (Surprise!) Lose in Crash, The New York Post, Dec. 1, 2001, at 27.

Additionally, the Complaint cites numerous SEC filings, press releases, and the like to establish various elements of plaintiffs' legal theory. For example, plaintiffs state that, on February 6, 2001, the Fund filed an Annual Report with the SEC revealing an Enron stake of more than 2.4 million shares as of November 30, 2000. (Goggins Am. Compl. ¶ 73.) Plaintiffs further allege that, on November 8, 2001, "Enron revealed in an SEC filing that the actual amount of [a certain accounting restatement] was $462 million." (Id. ¶ 432.) Also, plaintiffs

5

state in the Complaint that, on December 2, 2001, "Enron was forced to file for bankruptcy. As a result, Enron's common stock has been rendered worthless."[5] (Id. ¶ 457.)

Defendants now move to dismiss, arguing that plaintiffs' Complaint is barred by the latter's failure to file within the one-year limitations period. Defendants contend that, as evidenced by the public information specifically cited in the Complaint, as well as publicly available information not included therein, plaintiffs were on so-called "inquiry notice" of the facts forming the basis of their Complaint before December 13, 2001, the date falling exactly one year prior to the filing of this action. Plaintiffs oppose the motion, arguing that information crucial to their causes of action was not publicly available before December 13, 2001. As such, they argue, inquiry notice could not, as a matter of law, have been imputed more than one year prior to the filing of their Complaint.

## DISCUSSION

I.   *Applicable Law*

Defendants seek judgment on the pleadings. This Court's inquiry into the legal sufficiency of the Complaint is necessarily very limited, as the issue to be decided "'is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir.1997) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Thus, plaintiffs will not be entitled to

---

[5] Enron's U.S. bankruptcy filing was, of course, widely reported in various media. See, e.g., World News Now: World Business & Financial News (ABC television broadcast, Dec. 3, 2001); All Things Considered: Investigation into Enron's Collapse Extends to Their Auditors (NPR radio broadcast, Dec. 3, 2001); Chris Kraul, Enron's Demise Saps Houston's Energy, Los Angeles Times, Dec. 2, 2001, at pt. 3, p.1.

pursue their claims if those claims are facially untimely.

The Complaint alleges violations of sections 11, 12(a)(2), and 15 of the '33 Act.  Section 13 of the Act, which is the applicable statute of limitations, states in relevant part:

> No action shall be maintained to enforce any liability created under section 11 or section 12(a)(2) [of the '33 Act] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.

15 U.S.C. § 77m.[6]

The limitations period begins to run when the plaintiffs have actual notice of the misstatement or omission giving rise to the cause of action, or, as the Third Circuit recently recognized, when the plaintiffs are placed on "inquiry" notice of such culpable behavior.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325 (3d Cir. 2002).  Under the inquiry notice standard, the limitations period commences when the plaintiffs, in the exercise of reasonable diligence, should have discovered the basis for their claim.  Id.  Whether the plaintiffs should have discovered these facts "depends on whether they had 'sufficient information of possible wrongdoing to place them on "inquiry" notice or to excite "storm warnings" of culpable activity.'"  Id. (quoting Gruber v. Price Waterhouse, 697 F. Supp. 859, 864 (E.D. Pa. 1988)).  The test is an objective one and focuses on whether a "reasonable investor of ordinary intelligence" would have discovered the questionable conduct and identified it as a storm warning.  Id. (quoting Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 252 (3d Cir. 2001)).  "Plaintiffs need not know all of the details or 'narrow aspects' of the alleged fraud to trigger the

---

[6] Plaintiffs' claim under section 15, which concerns control persons such as Harrison, is also governed by the one-year limitations period.  See Hill v. Equitable Bank, Nat'l Ass'n, 599 F. Supp. 1062, 1078 (D. Del. 1984).

7

limitations period; instead, the period begins to run from the 'time at which plaintiff[s] should have discovered the general fraudulent scheme.'" Id. at 1326 (internal citations omitted).  When the limitations period is triggered by sufficient storm warnings, plaintiffs are charged with constructive knowledge of all information discoverable through diligent research during that period.  Id.

The Third Circuit has not been particularly explicit in defining what form a storm warning may take, but it seems clear that the universe of possible manifestations is quite expansive.  See id. at 1325 n.2 (quoting Mathews, 260 F.3d at 252, which lists "accumulation of information over a period of time" and "any financial, legal or other data" among the possible types of storm warnings).  In NAHC itself, SEC filings and press releases were deemed sufficient storm warnings to affirm dismissal of securities fraud claims for untimeliness.  See id. at 1326-27.  Further, other circuits have considered publicly available news articles in the storm warning calculus and upheld dismissal of claims for failure to act upon such articles among other warnings.  See LC Capital Partners v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003) (upholding district court's finding that storm warnings, which included press releases and an article in the National Underwriter, had triggered a duty of inquiry that plaintiff failed to fulfill); Eckstein v. Balcor Film Investors, 58 F.3d 1162, 1169 (7th Cir. 1995) (upholding district court's finding that storm warnings, which included a registration statement and reports "in the press," had triggered limitations period).

II.   *Whether the Goggins Plaintiffs Were on Inquiry Notice Before December 13, 2001*

    A.   Necessary Facts to Be Pled

As discussed, the legal theory of the Complaint is that, in light of the Fund's recklessly

aggressive purchasing of the objectively risky and deceit-laden securities of Enron, representations in the Fund's prospectus and elsewhere concerning investment discipline and the like were false and misleading. To support this theory, which plaintiffs root in sections 11 and 12(a)(2) of the '33 Act, they must plead the fact that they purchased securities pursuant to a materially false registration statement and prospectus. See In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 273 (3d Cir. 2004). While sections 11 and 12(a)(2) contain no scienter requirement, see id. at 274 n.7, plaintiffs must plead the facts that would establish the misleading nature of the prospectus, namely, that defendants disregarded their investment strategies when they purchased millions of shares of Enron. Additionally, plaintiffs, at least with respect to section 12(a)(2), are required to plead loss resulting from defendants' actions and omissions. See 15 U.S.C. § 77l(a)(2); In re AOL Time Warner, Inc. Securities & "ERISA" Litig., No. 02-5575, 2004 U.S. Dist. LEXIS 7917, at *141-42 (S.D.N.Y. May 5, 2004).

    B.    Sufficiency of Information Available to Plaintiffs

By December 13, 2001, plaintiffs were on inquiry notice of defendants' allegedly culpable behavior. The information necessary to state a cause of action under the relevant statutes – to wit, defendants' inattention to their investment standards in buying Enron stock and the loss resulting therefrom – was widespread within the public domain.

    1.    Storm Warnings[7]

---

[7] The Court is not particularly persuaded by plaintiffs' arguments concerning the fact-intensive nature of the storm warning analysis and the legal sufficiency vel non of the number and type of articles in the public domain. (See Pls.' Br. at 15-18.) Other courts have relied on far fewer and less mainstream articles than those relied upon in the Complaint and otherwise in the public domain. See LC Capital, 318 F.3d at 155 (relying somewhat heavily on one article in the National Underwriter); cf. In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 378 n.61 (S.D.N.Y. 2003) ("In LC Capital, the article was published in a more

9

The storm warnings were fairly severe. First, plaintiffs were aware, or should have been aware, that the Fund held a tremendous quantity of Enron shares. They allege in the Complaint that defendants filed an Annual Report on February 6, 2001, which was distributed to shareholders along with the Fund's Prospectus, and which revealed that the Fund held more than 2.4 million shares of Enron. (Goggins Am. Compl. ¶ 73.) Plaintiffs' original Complaint cites a Dow Jones Newswire story, published December 4, 2001, which reported that the Fund had substantial holdings of Enron. (Goggins Compl. ¶ 15.) Moreover, articles not cited in the Complaint,[8] such as a November 29, 2001 article in the Wall Street Journal reporting a tremendous drop in value of the Fund's Enron holdings, and a San Francisco Chronicle article published December 4, 2001 reporting that the Fund held 16.7 million shares of Enron as of its September 30 filing, make clear that the Fund had significant Enron exposure. Therefore,

---

obscure source than the more mainstream publications at issue here, such as The Wall Street Journal ... and the Economist.").

[8]The Court will consider these articles notwithstanding their absence from the Complaint. Plaintiffs' appeal of Judge Hedges' denial of their motion to strike is therefore DENIED. The Complaint explicitly identifies plaintiffs' reliance on "relevant articles that appeared in newspapers, magazines and other publications." (Goggins Am. Compl. Preamble.) Consequently, plaintiffs have brought that universe of "relevant articles" within the Court's purview for purposes of this motion. See Burlington Coat Factory, 114 F.3d at 1426 (holding that district court may consider documents "integral to or explicitly relied upon in the complaint" in deciding motions to dismiss). Moreover, even if this Court declined to interpret the explicit language in the Complaint as having opened the door for consideration of extrinsic documents, it could permissibly take judicial notice of publicly available documents. The inquiry notice standard is objective, NAHC, 306 F.3d at 1325, and plaintiffs may therefore be charged with knowledge of relevant public information. See Merrill Lynch, 273 F. Supp. 2d at 378-79. Plaintiffs would have this Court permit them to "cherry-pick" just enough articles to establish prima facie liability, yet just too few to establish inquiry notice as a matter of law. The Court will not countenance such an approach.

plaintiffs were on inquiry notice, if not actual notice,[9] that the Fund held millions of shares of Enron throughout Class Period.

Second, it simply cannot be gainsaid that the likely impropriety of Enron's accounting practices, the questionable off-balance-sheet transactions, the probable malfeasance on the part of Enron's executives, and other issues impacting the health of any publicly-traded company were well-publicized during the months leading up to December 13, 2001. Indeed, Enron filed for bankruptcy on December 2, 2001, an event plaintiffs cite in their Complaint. (Goggins Am. Compl. ¶ 457.) Plaintiffs also, as set forth above, cite to dozens of articles chronicling the impending doom of Enron, all of which predate the December 13, 2001 cutoff.

Third, there was ample evidence in the public domain that the Fund was losing hundreds of millions of dollars as a result of its ill-considered Enron investment. As discussed, articles in the Wall Street Journal, the Houston Chronicle, the San Francisco Chronicle, and the New York Post reported that the Fund had incurred paper losses ranging from $445 million to over $1 billion, and that Harrison had admitted he failed to respond to the "red flag" of Skilling's departure. Moreover, it would have been obvious to a reasonable investor of ordinary intelligence that, knowing the Fund held a substantial stake in Enron, the precipitous decline of Enron common stock would result in significant Fund losses. After all, Enron's stock price went from a high of more than $80 at the beginning of 2001 to close at $1.01 on December 5, 2001. See Joanne Wojcik, Enron Employees Enraged Over Losses, Business Insurance, Dec. 10, 2001,

---

[9]Because plaintiffs implicitly state in their Complaint that they possessed the February 2001 Annual Report, which reported significant Enron holdings during the class period, they may be charged with knowledge of the contents of that Report. See Dodds v. Cigna Sec., Inc., 12 F.3d 346, 351 (2d Cir. 1993).

at 32.

For all these reasons, plaintiffs should have discovered before December 13, 2001 "the general fraudulent scheme" they allege in their Complaint. NAHC, 306 F.3d at 1326. The Fund's stake in Enron was publicized in filings and articles, Enron's misdeeds were virtually common knowledge, and the Fund's losses were both public and obvious. These storm warnings "would alert a reasonable person to the probability that misleading statements ... had been made" in the Fund's Prospectus concerning its investment discipline. Id. at 1325 n.5 (quoting Mathews, 260 F.3d at 252). As such, plaintiffs are charged with constructive notice of all information that could have been discovered through diligent research. Id. at 1326.

Indeed, the facts of this action are sufficiently analogous to those in NAHC. In NAHC, inquiry notice was imputed to the plaintiffs when it was found that the defendant's public filings and press releases had made it clear that a certain segment of the company was in deep trouble. See 306 F.3d at 1326. This public information, the Third Circuit reasoned, excited storm warnings that certain of the defendant's previous filings, which failed to adjust the goodwill value of the troubled segment, were misleading. See id. at 1326-27. Of further note is the fact that the plaintiffs in NAHC had actually pled in their complaint that the financial markets had discounted the value of the troubled segment. Id. at 1327.

Likewise, here plaintiffs have pled numerous facts conclusively demonstrating the existence of storm warnings months before December 13, 2001. These pleadings and other facts properly before the Court establish that, as in NAHC, information either in the plaintiffs' possession or within the public domain was sufficient to put plaintiffs on inquiry notice that representations made in previous filings were misleading.

12

Plaintiffs' arguments tend to obfuscate the inquiry notice standard. For example, they argue that certain information available after December 13, 2001 was "critical" to their Complaint. Specifically, a U.S. Senate committee issued a report in July 2002 that purportedly concluded that Frank Savage, a member of both the Fund's and Enron's boards, had access to non-public information concerning mismanagement at Enron. Plaintiffs maintain that this information was "the key ingredient" to their claims. (Pls.' Br. at 3, 6-8.) Also, plaintiffs draw the Court's attention to articles published after December 13, 2001 attributing seemingly incriminating statements to Harrison. (Id. at 8.) While this information may be highly relevant to plaintiffs' claims as a general matter, it has little bearing on the inquiry notice analysis. First, defendants are correct in arguing that plaintiffs' original Complaint, filed five months after the Senate Report was released, failed to even mention that Report. Second, the Harrison statements reported in articles published after December 13 were clearly duplicative of other nearly identical admissions reported before that date in articles cited in the Complaint and otherwise in the public domain.

Were the Court to accept plaintiffs' arguments concerning the indispensable nature of certain post-December 13 disclosures, plaintiffs would be permitted to wait for all the details of the alleged fraud without concern for the limitations period. This would render section 13 a virtual nullity. This Circuit, among others, has not required knowledge of "all of the details or 'narrow aspects' of the alleged fraud to trigger the limitations period." NAHC, 306 F.3d at 1326; cf. Giant Group, Ltd. v. Sands, 142 F. Supp. 2d 503, 507 (S.D.N.Y. 2001) (holding that the limitations period is "not tolled for a plaintiff's leisurely discovery of the full details of the alleged scheme"). To the contrary, plaintiffs were on inquiry notice at that time when they

should have discovered the "general fraudulent scheme," NAHC, 306 F.3d at 1326, a period which commenced before December 13, 2001.

The storm warnings, as discussed at length, were more than sufficient to trigger plaintiffs' duty to investigate. Because plaintiffs fail to allege facts in the Complaint that would "'show that they exercised reasonable due diligence and yet were unable to discover their injuries,'" id. at 1327 (quoting Mathews, 260 F.3d at 252), their claims, filed in December 2002, are time-barred.

### 2. The Benak Complaint

On December 7, 2001, Patricia Benak, another plaintiff in this consolidated action, filed a complaint in this Court against defendant Alliance Capital Management, the Fund's investment advisor. Ms. Benak's complaint, while advancing a different legal theory, was strikingly similar to the Complaint filed by Patrick and Laura Goggins in the Southern District of New York more than one year later. Indeed, in transferring the Goggins action to this Court in 2003, Judge Sweet held that the "single most significant circumstance favoring transfer ... is the existence of the [Benak and] related actions in New Jersey." Goggins v. Alliance Capital Mgmt., 279 F. Supp. 2d 228, 234 (S.D.N.Y. 2003). "The defendants," Judge Sweet elaborated, "have established the substantial overlap in the allegations made by the [Goggins plaintiffs] and the plaintiffs in the Benak action. The Benak complaint alleges the same misrepresentations in public filings, relies on the same alleged statements made by the Fund's portfolio manager and alleges the same unheeded 'red flags.'" Id. The Benak and Goggins actions were subsequently consolidated pursuant to Rule 42, owing to common questions of fact. (Hedges, J., Order of 1/22/04.)

While this Court expresses no opinion concerning whether Patricia Benak was, or was not, a reasonable investor of ordinary intelligence, the stark similarity between her complaint and

14

plaintiffs' Complaint is relevant to the issue of inquiry notice in this action. Ms. Benak filed her Complaint one year and six days prior to the filing of plaintiffs' Complaint, and her action was so similar to plaintiffs' action that the latter was transferred to this Court and consolidated with the former. Obviously, the filing of a complaint is a manifestation of a plaintiff's knowledge of the facts upon which the cause of action is based, and in the case of Ms. Benak, she clearly had knowledge of the facts forming the basis for her complaint by, at the latest, December 7, 2001. Ms. Benak, therefore, had <u>actual</u> notice of the facts forming the core of the instant action well before the time that plaintiffs claim they were on <u>inquiry</u> notice.[10]

Whether Ms. Benak was an ordinary investor of reasonable intelligence, an extraordinarily vigilant and gifted investor, or something in between is not of particular concern within the context of this discussion, as that analysis pertains chiefly to the weight accorded the filing of her complaint, not to the Court's ability to consider the filing at all.[11] The Court here merely notes that the fact that <u>any</u> investor, brilliant or otherwise, filed a complaint on December 7, 2001 makes it far less likely that a reasonable investor of ordinary intelligence was not at least

---

[10] The Court appreciates plaintiffs' argument that, in light of the disincentives for drafting comprehensive initial complaints, it is unfair to compare the initial Benak complaint with the initial Goggins Complaint. Nevertheless, the filing of any complaint carries with it the duty of good faith factual support, <u>see</u> Fed. R. Civ. P. 11(b), and there is no suggestion that Ms. Benak lacked a factual basis for her allegations. Defendants are correct in their contention that Ms. Benak's complaint was dismissed for reasons of legal, not factual, insufficiency. Furthermore, it is indisputable that the original Benak complaint and the original Goggins Complaint relied on many of the same facts, and that the latter iterated <u>verbatim</u> many of those facts set forth in the former.

[11] Of course, if the Court were to hold that Ms. Benak <u>was</u> an ordinary investor of reasonable intelligence, plaintiffs would <u>ipso facto</u> lose on this motion. The Court would need more information to make that determination, however, and such information is not properly before it on a motion to dismiss.

on inquiry notice of the underlying facts of that same complaint by December 13, 2001. The very existence of the Benak complaint reinforces the Court's opinion that there were sufficient storm warnings prior to December 13, 2001 to trigger the limitations period for plaintiffs.

## **CONCLUSION**

For the reasons set forth herein, defendants' motion to dismiss is GRANTED.

DATED: December 10, 2004  /s/ Jose L. Linares
United States District Judge